UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| TANYA ANDERSEN, individually and on behalf of all others similarly situated, ) ) ) ) | No. CV 07-934 BR |
| Plaintiff ) ) | **DECLARATION OF MATTHEW J. OPPENHEIM** |
| v. ) ) ) | |
| ATLANTIC RECORDING CORPORATION, a Delaware corporation; PRIORITY RECORDS, LLC, a California limited liability company; CAPITOL RECORDS, INC., a Delaware corporation; UMG RECORDINGS, INC., a Delaware corporation; and BMG MUSIC, a New York general partnership; RECORDING INDUSTRY ASSOCIATION OF AMERICA; SAFENET, INC., f/k/a MEDIA SENTRY, INC., a Delaware corporation; SETTLEMENT SUPPORT CENTER, LLC, a Washington limited liability company ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

I, Matthew J. Oppenheim, declare and testify as follows:

1.      I am the principal of The Oppenheim Group LLP and an attorney admitted to

practice law in the States of Maryland and New York, as well as the District of Columbia.

In various different capacities, I have represented the record industry, including the

record company defendants in this case, for over ten years.  Among my retentions has

been oversight of the record industry's peer-to-peer enforcement program (the

"Enforcement Program").  I submit this declaration, which briefly presents certain limited

and indisputable facts, in opposition to Plaintiff's Motion for Class Certification.

1

2.      The Record Companies' nationwide Enforcement Program was conducted in two phases.  In the first phase, the Record Companies principally sought to enforce their copyrights against people who used commercial Internet Service Providers ("ISPs"), such as Verizon Online, to unlawfully upload or download copyrighted sound recordings.  In most cases during this first phase, once MediaSentry documented an Internet Protocol ("IP") address used for infringement, the Record Companies initiated a *Doe* lawsuit against the registered owner of the IP address.  The Record Companies then would seek permission from the court presiding over a *Doe* case to subpoena the ISP for the name of that registered owner.  When sending these subpoenas, the Record Companies requested ISPs to notify the registered owners that the Record Companies were seeking to identify them, so that these owners could, if they so chose, contact the Record Companies and begin a dialogue.  After the Record Companies learned the registered owners' name, they would send a Presuit Notification Letter ("PNL") to the person and seek to initiate a dialogue to resolve the copyright claims.

3.      The second phase of the Enforcement Program focused on people who used the internet connections of colleges and universities to unlawfully upload or download copyrighted sound recordings.  Many colleges and universities are themselves ISPs; they assign IP addresses to their individual students and faculty members just as commercial ISPs do.  In this second phase, the Record Companies sent letters to the ISP-provider schools, assigning unique ID numbers to each IP address that had been used for

infringement, and asked the schools to forward the letters to the students or employees to whom each address had been assigned.

4.    Upon receiving the Record Companies' letters, most colleges or universities forwarded them to the particular students or faculty members to whom the IP addresses used for infringement were registered. Those students and faculty could and did communicate directly with the Record Companies to settle their claims. These discussions occurred either anonymously (with the letter recipients identifying themselves only by means of the ID numbers assigned to their cases, as occurred in about 1300 cases) or by name. Some communicated telephonically, while others used an online system to communicate with the Record Companies and settle their cases. In those second-phase cases where the alleged infringers settled anonymously, the Record Companies never learned, and currently do not know, their names.

5.    If an educational institution did not forward the Record Companies' letters to the students and faculty to whom the IP addresses in question were registered, the Record Companies often initiated *Doe* lawsuits and, with judicial permission, issued subpoenas to learn the identities of the registered owners. In some other cases, the Record Companies took no further action, and the students did not learn of the Record Companies' pursuit of a claim against them.

6.    The information provided below regarding the individuals contacted during the Enforcement Program, and the ways in which their cases were resolved, are calculations

based upon my review of our case management database. Because this database was not designed to calculate the number of cases that were resolved at a particular stage or in a particular manner, there may be slight deviations below from the actual numbers.

7.      During both phases of the Enforcement Program, the Record Companies contacted over 18,000 people. Approximately 12,500 of these people were identified by means of *Doe* suits and subpoenas to ISPs. Another 5,100 received PNLs forwarded by their ISPs. Approximately 600 people were sent PNLs after they had been identified by other means, such as affidavits from the registered owners of IP addresses naming these others as the people who used the affiants' computers for unlawful copying.

8.      In about 4,000 of the 18,000 cases described above, the people responsible for the IP addresses settled the claims either before they were identified by their ISP or in response to a PNL that was forwarded to them by their ISP. Slightly more than half of these 4,000 cases were college and university students or faculty members who settled before being named in a *Doe* suit or any other complaint.

9.      Of the 18,000 cases, approximately 7,000 resulted in a non-*Doe* lawsuit against a named individual. The rest ended without litigation, either because the PNL recipient settled, or because the Record Companies, for any number of reasons, chose not to sue.

10.     Of the cases in which the Record Companies filed a lawsuit against a named person, in more than 100 instances, the defendants attempted to assert counterclaims against the Record Companies. These counterclaims routinely have been dismissed as

violative of the *Noerr-Pennington* doctrine, or on other grounds. The Record Companies discussed a number of their cases in their Motion for Summary Judgment, and other decisions in their favor have been issued since then. Attached as Exhibit A is the Notice of Electronic Filing of an order, entered June 15, 2009, dismissing a defendant's abuse of process counterclaim in *Capitol Records, Inc. v. Alaujan*, No. 1:03-cv-11661 (D. Mass. electronic order entered June 15, 2009). Attached as Exhibit B is another order, dated June 2, 2009, dismissing a defendant's civil conspiracy counterclaim in *Atlantic Recording Corp. v. Raleigh*, No. 4:06-CV-1708 (CEJ) (E.D. Mo. June 2, 2009).

11.    Other defendants, while not asserting counterclaims, have in the course of their defenses offered arguments identical or similar to those Ms. Andersen makes in this case. These arguments also routinely have been rejected. Again, the Record Companies discussed many of these cases in their Motion for Summary Judgment, but again, there have been more decisions in their favor since then. Attached as Exhibit C, for example, is an Order, dated June 11, 2009, rejecting claims that MediaSentry's activities amounted to "private investigation" in violation of state and federal law in *Capitol Records, Inc. v. Thomas-Rasset*, No. 06-1497 (MJD/RLE) (D. Minn. June 11, 2009).

12.    In cases where PNL recipients settled before being named in individual lawsuits, the people who settled did not receive releases of claims. The Record Companies promised not to pursue any further action against settling persons, and kept those promises. In the event that a settling person were to assert a claim against the Record Companies, however — either themselves or derivatively, such as through the class

action Ms. Andersen seeks to pursue on their behalf — the Record Companies would likely defend the action by demonstrating that these claimants infringed, and thus cannot claim "abuse of process" or any of the other torts Ms. Andersen asserts. Upon demonstrating this infringement in court, the Record Companies would have the legal right to damages far in excess of prior settlement payments. Indeed, in the overwhelming number of instances, the settlement amounts were only a fraction of the minimum statutory damages that would have been due had the case actually been litigated.

13.    In cases where people settled only after the Record Companies had sued them by name, the Stipulations to Judgment and Permanent Injunction that memorialized most settlements included provisions in which the defendants "irrevocably and fully waive[d] any and all right to appeal th[e] Judgment and Permanent Injunction, to have it vacated or set aside, to seek or obtain a new trial thereon, or otherwise to attack in any way, directly or collaterally, its validity or enforceability." Attached as Exhibit D is an example of a Stipulation to Judgment and Permanent Injunction which was entered into with Oregon Resident Thomas Burgess. Exhibit D is typical of these stipulations; substantially all other stipulations entered around the country contain similar language. The Record Companies' position is that these stipulations bar the signatories from pursuing, either directly or derivatively, the types of claims Ms. Andersen seeks to assert in this case.

14.    In lawsuits that entered the discovery phase, there were many instances in which the Record Companies sought discovery, the defendants opposed particular requests, and federal judges agreed with the Record Companies and ordered their requested discovery.

Attached as Exhibit E is an Order dated October 27, 2006, granting the Record Companies' motion in part to compel the defendant to produce her computer for copying and inspection in *Sony BMG Music Entm't, et al v. Arellanes*, No. 4:05-CV-328 (E.D. Tex. Oct. 27, 2006). Attached as Exhibit F is an Order dated January 25, 2006, granting the Record Companies' motion to compel the defendant to produce her computer for copying and inspection in *Arista Records, LLC, et al v. Tschirhart*, No. SA05CA0372OG (W.D. Tex. Jan. 25, 2006). Attached as Exhibit G is a Notice of Electronic Filing of an Order, dated January 16, 2008, granting the Record Companies' motion to compel the defendant to produce his external hard drive and denying defendant's request to deem his deposition waived based on what he believed to be unreasonable delay in *UMG Recordings, Inc. et al v. Lindor*, No. 1:05-cv-1095 (E.D.N.Y. Jan. 16, 2008). These are just three examples; the Record Companies could produce many more if the Court would find them useful to its consideration of Ms. Andersen's motion.

15.    In the only case to go to trial since the inception of the Enforcement Program, a federal jury returned a $1.92 million verdict in the Record Companies' favor against Jammie Thomas-Rasset, another individual that was sued as part of the Enforcement Program. Attached as Exhibit H is a Judgment in a Civil Case, dated June 19, 2009, in *Capitol Records, Inc. v. Thomas-Rasset*, No. 06-1497 (MJD/RLE) (D. Minn. June 19, 2009).

16.    Attached as Exhibit I is an excerpt from the Deposition of Christopher Connelly, which took place on May 28, 2009.

17.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this 24ᵗʰ day of June, 2009 at Potmac, MD .

Matthew J. Oppenheim

**From:** ECFnotice@mad.uscourts.gov [mailto:ECFnotice@mad.uscourts.gov]
**Sent:** Monday, June 15, 2009 8:02 AM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:03-cv-11661-NG Capital Records, Inc. et al v. Alaujan Order on Motion to Dismiss

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 6/15/2009 at 10:01 AM EDT and filed on 6/15/2009
**Case Name:**       Capital Records, Inc. et al v. Alaujan
**Case Number:**     1:03-cv-11661
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Judge Nancy Gertner: Electronic ORDER entered granting [670] Motion to Dismiss Counterclaims Asserted By Defendant Joel Tenenbaum by All Plaintiffs; denying [693] Motion to Add the Recording Industry Association of America (RIAA) as a Party to Defendant's Amended Counterclaim by Joel Tenenbaum. "The Plaintiffs Motion to Dismiss Counterclaims [#670] is GRANTED. Defendants Motion to Join the RIAA [#693] is DENIED as moot. The Supreme Court has held that no federal cause of action for abuse of process exists. Wheeldin v. Wheeler, 373 U.S. 647, 652 (1963); see also Berisic v. Winckelman, 2003 WL 21714930, at *2 (S.D.N.Y. 2003); Voors v. National Women's Health Org., Inc., 611 F.Supp. 203, 207 (D.C. Ind. 1985) (refusing to find a federal question even where defendants alleged that the court process abused was the federal court process). Even if this Court were to decide that Wheeldin were inapposite based on its facts, it still would reject the Defendant's federal abuse of process claim for the very same reason that his state abuse of process claim fails. Any abuse of process**

necessarily involves an attempt to coerce a defendant into surrendering some collateral benefit through court process. It "consists of using process to accomplish some ulterior purpose for which it was not designed or intended, or which [i]s not the legitimate purpose of the particular process employed." Davidson v. Cao, 211 F.Supp.2d 264, 287 (D. Mass. 2002) (citations omitted). In this quality, abuse of process resembles extortion. See Restatement (Second) of Torts s. 682. Yet the Defendant has identified no such ulterior motive or purpose here. Settlements driven by large potential damages and costly lawyers' fees are not the equivalent of extortion -- they are the calculus faced by almost every civil defendant. Even if the Court views file-sharing lawsuits as unwise and the statutory penalties a remarkably poor policy judgment, the objectives sought by this suit are well within those contemplated by Congress and the Copyright Act, 17 U.S.C. s. 101 et seq. The Plaintiffs seek to recover damages for copyright infringement expressly authorized by statute, and to deter others' infringing activities -- a purpose that both Congress and the Supreme Court have credited in this very context. See H.R. Rep. No. 106-216, at 3 (1999); Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 940 (2005) (approving contributory liability for copyright infringement occurring on file-sharing networks, based on "evidence of infringement on a gigantic scale"). The Defendant's allegation that the Plaintiffs, through these lawsuits, seek to "close the Net" amounts to little more than a claim that they have sought to broadly deter the unauthorized online distribution of copyrighted sound files. Put simply, the effort to deter an activity prohibited by Congress -- by attempting to enforce precisely the rights created by Congress -- does not constitute an abuse of process. See Vahlsing v. Commercial Union Ins. Co., Inc., 928 F.2d 486, 490 (1st Cir. 1991) ("[w]hen process is employed for the purpose for which the law intends its use, no abuse of process occurs."). The Defendant appears to believe that this lawsuit constitutes an "abuse of process" because it is part of a wider campaign targeting file-sharing activities, one which has swept up large numbers of young people accused of downloading and distributing copyrighted works, many of whom cannot afford counsel. The Court has expressed its views on the Plaintiffs' litigation campaign before. But abuse of process, as the cause of action is defined, does not turn on the identity of the defendants, their ability to hire an attorney, nor their inclination to settle the claims against them. Congress has handed the Plaintiffs a massive hammer to combat copyright infringement, and they have chosen to use it. That choice, whether wise or unwise, does not amount to an abuse of process." (Gaudet, Jennifer)


**1:03-cv-11661 Notice has been electronically mailed to:**

Matthew H. Feinberg mattfein@feinberg-kamholtz.com, rgifford@feinberg-kamholtz.com

Matthew A. Kamholtz mattkamh@feinberg-kamholtz.com

Michael A. Kehoe mak@psh.com

Kenneth J. Parsigian kparsigian@goodwinprocter.com

Charles J. DiMare cjdimare3152@aol.com, cdimare@stuaf.umass.edu

Mary T. Sullivan msullivan@segalroitman.com, jstein@segalroitman.com, sgillin@segalroitman.com

Terence K. Ankner tka@anknerlaw.com

Ronald N. Whitney rwhitneylaw@hotmail.com

John J. Regan jreganesq@aol.com

Daniel T. Doyle ddoylepc@comcast.net

Mark A. Walsh mark.walsh@dl.com

Donna L. Conley countess2@msn.com

Seth M. Yurdin syurdin@hotmail.com

Daniel J. Cloherty dcloherty@dwyercollora.com, loconnor@dwyercollora.com, morr@dwyercollora.com, vsteinberg@dwyercollora.com

Charles Nesson nesson@law.harvard.edu, nesson@law.harvard.edu, imeister@cyber.law.harvard.edu, mharding@law.harvard.edu, ray@beckermanlegal.com

Raymond Sayeg, Jr rsayegesq@aol.com

Theodore G. Fletcher law@tgfletcher.us

Simon B. Mann smann@arnowitzandgoldberg.com

Eve G. Burton eve.burton@hro.com, eve.burton@hro.com

Laurie Rust laurie.rust@hro.com, della.grant@hro.com, joel.rayala@hro.com

Timothy M. Reynolds timothy.reynolds@hro.com, timothy.reynolds@hro.com, anne.allen@hro.com

Michelle Bennett michelle.bennett@usdoj.gov

Debra B. Rosenbaum drosenbaum@law.harvard.edu

Jennifer L. Dawson jdawson@law.harvard.edu

James E. Richardson jrichardson@law.harvard.edu

Matthew C. Sanchez msanchez@law.harvard.edu

Anna V. Volftsun avolftsun@law.harvard.edu

Victoria L. Steinberg vsteinberg@dwyercollora.com

Free Software Foundation law@tgfletcher.us

**1:03-cv-11661 Notice will not be electronically mailed to:**

Interscope Records

Maverick Recording Company


Warner Bros. Records Inc.


Charles M. MacLean
869 Concord Street
Framingham, MA 01701

Charmaine M. Blanchard
Law Offices of John J. McGlynn, Jr.
4 Norman Street
Salem, MA 01970

Diane Briggs
7 Ponkapoag Way
Canton, MA 02021

Diane Cabell
1587 Massachusetts Avenue
Cambridge, MA 02138

Douglas T. Evans
58 Main Street
Topsfield, MA 01983

George W. Gray , Jr
Law Office of George W. Gray Jr.
110 Haverhill St.
Suite 315
Amesbury, MA 01913

John Palfrey
1587 Massachusetts Avenue
Cambridge, MA 02138

John J. McGlynn , Jr
Law Office of John J. McGlynn, Jr.
4 Norman Street
Salem, MA 01970

Katheryn J. Coggon
Holme Roberts & Owen LLP
Suite 4100
1700 Lincoln Street
Denver, CO 80203-4541


Michael Fitzgerald
11 Pineridge Road

Wilmington, MA 01887

Michael Manzi
Law Office of Michael Manzi
59 Jackson Street
Lawrence, MA 01840

Paul A. Shneyer
Shneyer & Associates Ltd.
1991 Broadway OFC 2
New York, NY 10023-5828

Steven Karol
Karol & Karol
424 Adams Street
Milton, Ma 02186

Yevgeniya Shnayder
31 Star Road
Newton, MA 02465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ATLANTIC RECORDING CORP.,  )
et al.,                    )
                           )
        Plaintiffs,        )
                           )
    vs.                    )        No. 4:06-CV-1708 (CEJ)
                           )
JENNA RALEIGH,             )
                           )
        Defendant.         )

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiffs' motion to strike, or, in the alternative, to dismiss defendant's amended counterclaims. Defendant has responded and the issues are fully briefed.

### I.    Background

Plaintiffs are copyright owners or licensees of exclusive rights with respect to certain copyrighted sound recordings. Defendant is an individual, who resides in the Eastern District of Missouri.

On November 28, 2006, plaintiffs filed a complaint pursuant to 16 U.S.C. § 101, *et seq.*, seeking damages and equitable relief. On September 5, 2007, defendant filed an answer and counterclaims asserting violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), (Count I), conspiracy to violate RICO (Count II), fraudulent misrepresentation (Count III), prima facie tort (Count IV), and conspiracy (Count V). On August 18, 2008, the Court granted plaintiffs' motion to dismiss defendant's counterclaims for failure to state a claim, and denied defendant's motion for leave to amend her counterclaims. On September 12, 2008, the Court issued a Case Management Order, which stated that "[a]ny joinder of additional parties or amendment of pleadings shall be no later than **November 17,**

**2008**.  Thereafter, the parties must file a motion for leave to join additional parties or to amend pleadings." (Doc. #49, at 1) (emphasis in original).    On November 17, 2008, defendant filed amended counterclaims, which included the same counterclaims she had previously asserted, along with three new counterclaims for trespass to chattels (Count VI), violation of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, (Count VII), and conspiracy to commit trespass to chattel and to violate the CFAA (Count VIII).  (Doc. #52).

## II.    Discussion

Plaintiffs move to (1) strike defendant's counterclaims in their entirety for failure to seek leave, pursuant to Rule 15(a), Fed.R.Civ.P.; (2) strike Counts I, II, III, IV, and V of defendant's amended counterclaims and the re-plead factual allegations upon which the counterclaims are based because they were previously dismissed; and (3) dismiss Counts VI, VII, and VIII of defendant's amended counterclaims for failure to state a cause of action upon which relief can be granted, pursuant to Rule 12(b)(6), Fed.R.Civ.P.  The Court will not address defendant's trespass to chattels counterclaim (Count VI) because defendant states that she wishes to withdraw and dismiss it.

### A.    Plaintiffs' Motion to Strike Defendant's Amended Counterclaims in their Entirety

Rule 15(a), Fed.R.Civ.P., "governs the pretrial amendment of pleadings and states that where an amendment is not sought 'as a matter of course'-as defined by the Rule-'a party may amend its pleadings only with the opposing party's written consent or the court's leave.'" Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715 (8th Cir. 2008), citing Fed.R.Civ.P. 15(a)(2).  Rule 13(f), Fed.R.Civ.P., states that "[t]he court may permit a party to amend a pleading to add a counterclaim if it was omitted through oversight, inadvertence, or excusable neglect or if justice so requires."

- 2 -

Plaintiffs move to strike defendant's amended counterclaims in their entirety for failure to seek leave, pursuant to Rules 15(a) and 13(f), Fed.R.Civ.P.  In their reply, plaintiffs concede that "the Court granted both parties leave to amend their pleadings up to and including November 17, 2008." (Doc. #70, at 4).  Pursuant to the Court's order, defendant filed her amended counterclaims on November 17, 2008.  However, plaintiffs contend that, in order for defendant to add the counterclaims in Counts VII and VIII, Rules  13(f) and 15(a), Fed.R.Civ.P., required defendant to seek leave of court.  Plaintiffs' contention is without merit.  As stated above, the plain language of Rule 13 "permits a party to amend a pleading to <u>add</u> a counterclaim . . . ." Fed.R.Civ.P. 13(f) (emphasis added).  Therefore, because the Court granted both parties leave to amend their pleadings no later than November 17, 2008, and defendant timely filed her amended counterclaims, the Court will not strike defendant's amended counterclaims in their entirety.

### B.    Plaintiffs' Motion to Strike Defendant's Amended Counterclaims I through V and the Reasserted Allegations

Under Fed.R.Civ.P. 12(f), a court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike on this basis are not favored and are infrequently granted, because they propose a drastic remedy. <u>Southwestern Bell Telephone, L.P. v. Missouri Public Service Comm'n</u>, 461 F.Supp.2d 1055, 1064 (E.D. Mo. 2006), <u>citing</u> <u>Stanbury Law Firm, P.A., v. Internal Revenue Serv.</u>, 221 F.3d 1059, 1063 (8th Cir. 2000).  There is general judicial agreement that motions to strike should be denied "unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or

- 3 -

more of the parties to the action." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1382.

Plaintiffs contend that, "[i]n her [a]mended [c]ounterclaims I-V, [d]efendant re-alleges counterclaims which were dismissed by the Court on August 18, 2008." (Doc. #61, at 6). Because "these counterclaims, and the factual allegations on which they were based, have already been dismissed, they are redundant, immaterial, and impertinent to this case and should be stricken under Rule 12(f)." Id. In her amended counterclaims, defendant admits that Counts I through V were previously dismissed by the Court. However, she states that she re-alleged the counterclaims in order to preserve the issue of their dismissal for appeal. Because of the previous dismissal of the counterclaims and the factual allegations upon which they were based, Counts I, II, III, IV, an V of defendant's amended counterclaims and the factual allegations upon which these counterclaims are based (i.e., paragraphs 11, 13-16, 18-26, 28-32, 34-45, 47, 50-69, 77-78, 86-87, and 89-91) will be stricken.

### C. Plaintiffs' Motion to Dismiss Defendant's Amended Counterclaims VII and VIII

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint. The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atl. Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1965 (May 21, 2007), citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals  based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is

- 4 -

very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp., 127 S. Ct. at 1974. See also id. at 1969 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement."). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

### 1.    Count VII: Violation of the CFAA

In her seventh amended counterclaim, defendant asserts that plaintiffs violated 18 U.S.C. § 1030. Defendant does not identify any specific provision of the CFAA that plaintiffs allegedly violated. Examination of Count VII leads the Court to conclude that defendant's allegations are based on 18 U.S.C. § 1030(a)(5)(C). Under this section, a violation occurs when a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." The CFAA defines: (1) "protected computer" as "a computer-- which is used in or affecting interstate . . . commerce or communication[;] and (2) "damage" as "any impairment to the integrity or availability of data, a program, a system or information[.]" 18 U.S.C. §§ 1030(e)(2)(B), 1030(e)(8). Additionally, the CFAA provides that:

> [T]he term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]

18 U.S.C. § 1030(e)(11).

Plaintiffs argue that defendant has failed to allege sufficient facts to show that: (1) plaintiffs accessed defendant's computer without authorization; and (2) defendant suffered damage and loss. The Court agrees. Defendant alleges that "[p]laintiffs . .

- 5 -

. intentionally accessed [her] computer[.]"  (Defendant's Am. Countercl., para. 132; Doc. #52, at 38).  However, defendant offers no supporting facts to bolster this conclusory allegation.  Defendant also alleges that her "computer[] and computer systems . . . were used in interstate commerce and/or communication." (Defendant's Am. Countercl., para. 133; Doc. #52, at 38). However, defendant provides no specific facts to explain how her computer was used in or affected interstate commerce.[1]  As such, defendant provides a conclusory allegation that her computer is a "protected computer" within the scope of the CFAA.  Finally, defendant alleges that "[plaintiffs'] conduct . . . resulted in impairment to the integrity and/or availability of data, a program, a system or information on [her] computer[.]" (Defendant's Am. Countercl., para. 133-34; Doc. #52, at 38).  With the exception of a few additional words and punctuation marks, this allegation only contains the statutory definition of the term "damage."  See 18 U.S.C. § 1030(e)(8).  Moreover, defendant offers no supporting facts to describe any impairment to her computer's data, programs, system, or information.  In sum, defendant's unsupported conclusory allegations contain nothing more than "a formulaic recitation of the elements" of a claim under 18 U.S.C. § 1030(a)(5)(C).[2]  Bell Atl. Corp., 127 S. Ct. at 1965.  Therefore, defendant's CFAA

---

[1]In her brief in opposition to plaintiffs' instant motion, defendant alleges that "[t]here is no question that [her] computer was used in a manner that affects interstate communication-it was through the computer's connection to the internet . . . . Thus, the computer was 'protected' for purposes of the statute." (Doc. #67, at 6).  However, defendant does not mention this allegation in her amended counterclaims.  As such, because "'matters outside the pleading' may not be considered in deciding a Rule 12 motion to dismiss," the Court will not consider this allegation. Enervations, Inc. v. Minn. Mining & Mfg. Co., 380 F.3d 1066, 1069 (8th Cir. 2004).

[2]In her response, defendant alleges that she has sustained a "loss" in excess of $5,000.  (Doc. #67, at 8).  However, this allegation does not appear in defendant's amended counterclaim.  As such, the Court will not consider this assertion.  See supra note 1 and accompanying text.

- 6 -

counterclaim fails to state a claim for which relief can be granted, and the Court will dismiss Count VII of defendant's amended counterclaims.

### 2.    Count VIII: Civil Conspiracy

In her last counterclaim, defendant alleges that plaintiffs "conspired and agreed to commit the unlawful acts alleged in Count[] VII[.]"[3] (Defendant's Am. Countercl., para. 139; Doc. #52, at 40).    Defendant alleges that, as a result of plaintiffs' conspiracy, she "suffered damages and incurred costs including legal fees." (Defendant's Am. Countercl., para. 142; Doc. #52, at 40).  Because Count VII is the sole basis for defendant's civil conspiracy claim, and the Court has found that Count VII fails to state a claim upon which relief can be granted, Count VIII must also be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion to strike, or, in the alternative, to dismiss defendant's amended counterclaims [Doc. #60] is **granted.**

An order of partial dismissal will accompany this Memorandum and Order.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of June, 2009.

---

[3]In the body of Count VIII, defendant alleges that her civil conspiracy claim is based on the "unlawful acts in Counts VI and VII above." (Defendant's Am. Countercl., para. 139; Doc. #52, at 40).  However, as noted above, defendant withdrew Count VI for trespass to chattels.  See (Doc. #67, at 5 n.3).

- 7 -

EXHIBIT B
Page 7 of 7

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CAPITOL RECORDS INC.,
a Delaware corporation;
SONY BMG MUSIC ENTERTAINMENT,
a Delaware general partnership;
ARISTA RECORDS LLC,
a Delaware limited liability company;
INTERSCOPE RECORDS,
a California general partnership;
WARNER BROS. RECORDS INC.,
a Delaware corporation; and
UMG RECORDINGS, INC.,
a Delaware corporation;

        Plaintiffs,

v.

JAMMIE THOMAS-RASSET,

        Defendant.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 06-1497 (MJD/RLE)

Andrew B. Mohraz, David A. Tonini, and Timothy M. Reynolds, Holme Roberts & Owen, LLP; Felicia J. Boyd, Kara L. B. Barrow, and Mary Andreleita Walker, Faegre & Benson, LLP; and Matthew J. Oppenheim, Oppenheim Group, LLP; counsel for Plaintiffs.

Joe Sibley and K. A. D. Camara, Camara & Sibley, LLP, and Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, counsel for Defendant.

1

EXHIBIT C
Page 1 of 27

This matter is before the Court on the parties' motions in limine.  The

Court heard oral argument on these motions on June 10, 2009.  Trial is set to

begin on June 15, 2009.

I.      **Defendant's Motion to Suppress Evidence** [Docket No. 263]

Defendant Jammie Thomas-Rasset argues that the Court should exclude all

evidence gathered by MediaSentry because it operated in violation of state and

federal laws and because Plaintiffs' attorneys violated ethical rules through their

involvement with MediaSentry.  Because the Court holds that MediaSentry has

not violated any of the asserted state or federal laws, it denies Defendant's

motion.

A.      **MediaSentry's Actions**

Peer-to-peer networks allow Internet users to connect to each other and

transfer files directly from user to user.  (Jacobson Decl. ¶ 2, Pls. Ex. A.)  When

files are distributed from one user to another user through a peer-to-peer

network, such as Kazaa, a set of identifying information ties the files back to the

user who distributed the files.  (Id. ¶ 3.)  This information includes the

distributor's IP address, the name of the file, the size of the file, the content hash,

2

EXHIBIT C
Page 2 of 27

and the port information.  (Id.)  The user requesting the files communicates the request that the sharing computer send the files, and the sharing computer then sends those requested files.  (Id. ¶ 5; Connelly Decl. ¶ 2, Pls. Ex. B.)  Kazaa does not allow one user to gain access into or to manipulate the contents of another user's computer. (Jacobson Decl. ¶ 5.)  It does allow a user to view the contents of the files that other users placed in the shared folder.  (Id.)

The Kazaa interface displays information about each file that is available in other users' shared folders.  MediaSentry recorded the image for each screen displayed by Kazaa that lists the available files.  It also used Kazaa to download selected files to its own machine to confirm that the files were copyrighted sound recordings.

The IP address is transmitted as part of the normal process of connecting one computer to another over the Internet. (Jacobson Decl. ¶ 6.)  When attempting to identify alleged infringers on peer-to-peer networks, MediaSentry used the same Kazaa network protocols that every other user used to search for and download files on the network. (Connelly Decl. ¶ 2.)  Files were transferred to MediaSentry by the uploader in the form of data packets, which contained information identifying the source IP address.  (Id.)  Through packet capture

3

EXHIBIT C
Page 3 of 27

technology, MediaSentry recorded the interaction between itself and the computer connected to the file sharing network and distributing the material to MediaSentry.  (Id.; 1 Trial Tr. 185.)  MediaSentry captured every packet transferred, which included the IP address of the source of the packet.  (1 Trial Tr. 187-88.)

### B.    The Minnesota Private Detectives Act

#### 1.    Whether MediaSentry Violated the Act

Defendant alleges that MediaSentry collected evidence against her in violation of the Minnesota Private Detectives Act, Minn. Stat. § 326.32, et seq. ("MPDA").  The MPDA provides:

> No person shall engage in the business of private detective or protective agent, or advertise or indicate in any verbal statement or in written material that the person is so engaged or available to supply those services, without having first obtained a license as provided in sections 326.32 to 326.339.

Minn. Stat. § 326.3381, subd. 1.  MediaSentry does not hold a private detective license in Minnesota.  (Def. Ex. A.)

Defendant argues that MediaSentry engaged in the business of being a private detective under multiple provisions of the statute:

> Persons who for a fee, reward, or other consideration, undertake any

4

EXHIBIT C
Page 4 of 27

of the following acts for the purpose of obtaining information for
others are considered to be engaged in the business of a private
detective:

* * *

(2) investigating the identity, habits, conduct, movements,
whereabouts, transactions, reputation, or character of any person or
organization;

(3) investigating the credibility of witnesses or other persons;

(4) investigating the location or recovery of lost or stolen property;
[or]

* * *

(8) obtaining through investigation evidence to be used before any
authorized investigating committee, board of award, board of
arbitration, administrative body, or officer or in preparation for trial
of civil or criminal cases;

Minn. Stat. § 326.338, subd. 1.  Defendant asserts that MediaSentry engaged in

each of the listed activities when it investigated the identity of the user of the

computer from which it downloaded the songs at issue in this lawsuit and when

it obtained evidence of the copyrighted songs on Defendant's computer.

Defendant also claims that MediaSentry violated the MPDA when it held itself

out to be a private detective; however, she has offered no admissible evidence of

such advertisement in Minnesota.

EXHIBIT C
Page 5 of 27

Defendant notes that the alleged violations of the MPDA are crimes under Minnesota law. <u>See</u> Minn. Stat. § 326.339.

The Court concludes that MediaSentry is not subject to the MPDA. Based on the language of the MPDA, the Act does not apply to persons or companies operating outside of the state of Minnesota. <u>See</u> Minn. Stat. § 326.3381, subd. 5 (providing procedures for licensing out-of-state applications for those who "establish a Minnesota office"). Additionally, there is a general presumption that Minnesota statutes do not apply extraterritorially. <u>See</u> <u>In re Pratt</u>, 18 N.W.2d 147, 153 (Minn. 1945), <u>cited in</u> <u>Harrington v. Northwest Airlines, Inc.</u>, No. A03-192, 2003 WL 22016032, at *2 n.1 (Minn. Ct. App. Aug. 26, 2003) (unpublished) (noting that Minnesota courts employ "the presumption against a state statute having extraterritorial application").

MediaSentry does not operate within Minnesota. (Connelly Decl. ¶ 3.) It has no employees in Minnesota and does not conduct any activities in Minnesota. (<u>Id.</u>) It pays no taxes in the state and has no agent for service of process here. (<u>Id.</u>) MediaSentry conducted no activity in Minnesota relating to this case, and all of the information it received was sent by Defendant from her computer to MediaSentry's computer in a state other than Minnesota. (<u>Id.</u>) Merely

6

EXHIBIT C
Page 6 of 27

monitoring incoming internet traffic sent from a computer in another state is

insufficient to constitute engaging in the business of private detective within the

state of Minnesota.

### C.     The Pen Register and Trap and Trace Devices Act

Defendant asserts that MediaSentry violated the Pen Register Act when it

recorded the packets that included the IP address of the sender.  It is a crime

under 18 U.S.C. § 3121 to "install or use a pen register or a trap and trace device,

without first obtaining a court order."

Under the statute both the term "pen register" and the term "trap and trace

device" are defined as devices or processes which capture certain information but

do not capture "the contents of any communication."  18 U.S.C. § 3127(3), (4).  See

also Columbia Pictures, Inc. v. Bunnell, 245 F.R.D. 443, 450 (C.D. Cal. 2007)

("[P]en registers and trap and trace devices, by definition, do not record 'the

contents of any communication.'") (citation omitted).

The Pen Register Act has no application here because the IP address

recorded by MediaSentry was part of the content of the communication.  The

metadata that is transmitted along with every file sent through the FastTrack

network used in this case always includes the IP address.  (Jacobson Decl. ¶ 6.)

7

EXHIBIT C
Page 7 of 27

Furthermore, the Pen Register Act cannot be intended to prevent individuals who receive electronic communications from recording the IP information sent to them. If it did apply in those cases, then the Internet could not function because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet. (Jacobson Decl. ¶ 4.)

Additionally, the Pen Register Act does not bar recordings of the contents of communications that are made with the consent of one of the parties to the communication. See, e.g., United States v. Millet, No. 05 CR 81, 2005 WL 3605269, at *1 (N.D. Ill. Nov. 3, 2005) ("And recordings made of conversations with the consent of one of the parties are permissible under federal law. The pen registers and trap-and-trace devices may well assist the government in determining the exact time and date of telephone calls and the telephones accessed, but they do not disclose the contents of the conversations, nor do they make illegal the consensual recordings."). In this case, the IP addresses were communicated as part of the packets Defendant's computer sent to MediaSentry's computer. MediaSentry, as a party to that communication, simply recorded the information transmitted to it from Thomas-Rasset's computer.

8

EXHIBIT C
Page 8 of 27

### D.    The Electronic Communications Privacy Act of 1986

The Electronic Communications Privacy Act of 1986 prohibits

unauthorized wiretapping:

> Except as otherwise specifically provided in this chapter any person who–
>
> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> * * *
>
> shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1).

Defendant claims that MediaSentry violated § 2511(1) by intercepting

electronic communications in the form of the packets traveling between Thomas-

Rasset's computer and MediaSentry's computer.  Defendant also claims that

MediaSentry violated the statute when it recorded images of the Kazaa interface.

She asserts that the display screen interface of Kazaa constituted an electronic

communication from the sender to the MediaSentry operator, communicating

information about the files on the sender's computer.

Assuming, without deciding, that MediaSentry's actions constituted

9

EXHIBIT C
Page 9 of 27

interception of an electronic communication, MediaSentry falls under the

participant exception to the Wiretap Act.  Section 2511(2)(d) provides:

> It shall not be unlawful under this chapter for a person not acting
> under color of law to intercept a wire, oral, or electronic
> communication where such person is a party to the communication
> or where one of the parties to the communication has given prior
> consent to such interception unless such communication is
> intercepted for the purpose of committing any criminal or tortious
> act in violation of the Constitution or laws of the United States or of
> any State.

18 U.S.C.A. § 2511(2)(d).

MediaSentry was clearly a party to the electronic communication with

Defendant.  Defendant asserts that this exception does not protect MediaSentry

because MediaSentry was intercepting communications for the purpose of

committing the crime under Minnesota law of engaging in the business of a

private detective without a license, committing the crime under federal law of

recording IP addresses in violation of the Pen Register Act, and committing the

Minnesota tort of intrusion upon seclusion.

MediaSentry did not intercept the communications for the purpose of

committing a crime or tort.  As the Court has already held, MediaSentry did not

commit a crime under the MPDA or under the Pen Register Act.  Although

10

EXHIBIT C
Page 10 of 27

Defendant has vaguely alluded to private detective licensing laws from other states, there is no evidence or legal argument before the Court upon which the Court could conclude that MediaSentry was subject to and violated another state's private detective law in this case.  Even if, in capturing the information sent from Defendant's computer, MediaSentry had incidentally violated a private detective licensing statute from some other state, gathering evidence of Defendant's alleged copyright infringement cannot be said to have been accomplished <u>for the purpose</u> of committing a tort or crime.  <u>See</u> <u>Meredith v. Gavin</u>, 446 F.2d 794, 798 (8th Cir. 1971) (discussing legislative history of exception to one-party consent exception to the Wiretap Act, which was aimed at "monitoring . . . for insidious purposes such as blackmail, stealing business secrets" and holding that exception applied when recorder's "purpose is evil").

The tort of intrusion upon seclusion occurs when one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  <u>Lake v. Wal-Mart Stores, Inc.</u>, 582 N.W.2d 231, 233 (Minn. 1998) (footnote omitted).  Thomas-Rasset asserts that MediaSentry's actions would be highly offensive to a reasonable person.  The Court disagrees.  There is

11

EXHIBIT C
Page 11 of 27

no expectation of solitude or seclusion when a person activates a file sharing

program and sends a file to the requesting computer.  By participating in Kazaa,

a user expects millions of other users to view and copy her files, each time

receiving the very information that Thomas-Rasset sent to MediaSentry and

MediaSentry recorded.

### E.    Ethical Violations

Defendant asserts that the Court should suppress evidence gained by

MediaSentry because it was illegally obtained at the direction and under the

supervision of Plaintiffs' lawyers in violation of their ethical obligations.  The

Court has held that MediaSentry did not illegally obtain the evidence in question.

MediaSentry acted for the legitimate purpose of discovering infringers and

protecting its clients' copyrights.  Therefore, there was no ethical violation

committed by Plaintiffs' attorneys' involvement with MediaSentry's

investigation.

### F.    Conclusion

Because Defendant has failed to show that MediaSentry violated any law

in gathering the evidence to be used in this case, Defendant's motion to suppress

is denied.

12

EXHIBIT C
Page 12 of 27

II.    **Plaintiffs' Motion in Limine to Exclude the Testimony of Defendant's Expert Dr. Yongdae Kim** [Docket No. 272]

A.    **Daubert Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. The proponent of the testimony has the burden to show by a preponderance of the evidence that the testimony is admissible under Rule 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). Under the Rule:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in Daubert, trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable. Trial courts are given broad discretion in fulfilling this gatekeeping role . . . ." Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted). The proposed testimony must be useful to the factfinder in deciding the ultimate fact issue; the expert witness must be qualified; and the proposed

13

EXHIBIT C
Page 13 of 27

evidence must be reliable.  Lauzon, 270 F.3d at 686.

When considering the reliability and relevance of expert testimony, the

Court may examine "whether the theory or technique is subject to testing,

whether it has been tested, whether it has been subjected to peer review and

publication, whether there is a high known or potential rate of error associated

with it, and whether it is generally accepted within the relevant community."

Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).

The Court's inquiry is "flexible and fact specific."  Id.

> As a general rule, the factual basis of an expert opinion goes to
> the credibility of the testimony, not the admissibility, and it is up to
> the opposing party to examine the factual basis for the opinion in
> cross-examination.  Only if the expert's opinion is so fundamentally
> unsupported that it can offer no assistance to the jury must such
> testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

**B.   Factual Basis for Kim's Opinion**

Defendant's expert witness is Dr. Yongdae Kim, as Associate Professor in

the University of Minnesota Department of Computer Science.  Kim will not offer

an opinion regarding whether Thomas-Rasset infringed Plaintiffs' copyrights or

whether her computer was used to distribute their copyrighted sound

14

EXHIBIT C
Page 14 of 27

recordings.  Instead, Kim will offer possible explanations regarding how

someone other than Thomas-Rasset could have committed the file sharing at

issue in this case.  Plaintiffs argue that, although Kim lists fourteen possible

explanations in his report, he admits that there is no evidence to support any of

the explanations.

Defendant retorts that Kim will only offer rebuttal testimony to assist the

jury in properly weighing the evidence regarding the origin of the Kazaa

software and the allegedly infringing songs on Defendant's computer.

Defendant admits that Kim will not offer an opinion regarding the probable

cause of the presence of Kazaa and the songs on Thomas-Rasset's computer.

Instead, he is merely offering his testimony as a rebuttal to the testimony of

Plaintiffs' expert witness.  Kim will opine on the reliability and weight of

Plaintiffs' expert's testimony.  Kim will also discuss possible alternative

explanations that Plaintiffs' expert did not consider in arriving at his conclusions.

Defendant asserts that testimony regarding possibilities, even if they are not

probable, is legally sufficient if the proposed expert is attempting to rebut the

testimony of another expert.  Defendant also argues that she does not bear the

burden of proof on the question of causation, so her expert does not need to

EXHIBIT C
Page 15 of 27

testify regarding probable causation, but can simply offer alternative

explanations to attack Plaintiffs' theory of causation.

As a defense rebuttal witness, Kim does not have to testify that the other

possible explanations were the probable cause that Kazaa and the sound

recordings at issue appeared to be on Defendant's computer. See, e.g., Allen v.

Brown Clinic, P.L.L.P., 531 F.3d 568, 574-75 (8th Cir. 2008) (holding that defense

expert could testify as to other possible, but not necessarily probable, causes of

plaintiff's injury, because, to require more would "unduly tie a defendant's

hands in rebutting a plaintiff's case, where as here, plaintiff's expert testifies that

no other cause could have caused plaintiff's injury," and would "impermissibly

shift the burden of proof and require a defendant to 'disprove' a plaintiff's theory

by a preponderance of the evidence") (citation omitted).  Because Kim is offered

only as a rebuttal expert, and only opines regarding possibilities in his report, his

testimony must be limited such that "remarks are made in rebuttal of Plaintiff's

expert and are not done to establish a cause." Morrison v. Stephenson, No.

2:06-CV-283, 2008 WL 618778, at *4 (S.D. Ohio Mar. 3, 2008).

Therefore, Kim can testify regarding the possible scenarios that can occur

on a peer-to-peer network that would result in the incorrect user being identified

EXHIBIT C
Page 16 of 27

by MediaSentry. Kim cannot opine regarding causation or what he thinks probably occurred in this case.

Plaintiffs note fourteen particular instances of Kim's testimony that they allege are unsupported and objectionable. Because Kim's testimony is limited to rebuttal and he is not permitted to testify as to causation, the Court rejects most of Plaintiffs' arguments regarding admissibility. The alleged lack of factual basis for many of Kim's opinions goes to credibility and provides ground for cross examination. However, the Court does hold that Kim cannot testify based purely on speculation or when, beyond lacking evidence to support his theory, the record only contains evidence that makes his theory impossible, and, thus, unhelpful to the jury. See Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006) ("Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case.") (citation omitted).

Therefore, given the evidence that there is no wireless router involved in this case, the Court excludes Kim's opinion that it is possible that someone could have spoofed or hijacked Defendant's Internet account through an unprotected wireless access point. Similarly, because Kim explicitly testified that this case does not involve any "black IP space," or any "temporarily unused" IP space

17

EXHIBIT C
Page 17 of 27

(Kim Dep. 110-11), he is not permitted to opine at trial that hijacking of black IP space or temporary unused IP is a possible explanation in this case.

In § 3.4 of his Report, Kim asserts that there is no evidence that the music files were "consciously placed" in the shared directory on Thomas-Rasset's computer or were willfully offered for distribution. Kim testified that he is not an expert in human behavior and that his opinion is based on nothing but "speculation." (Kim Dep. 127-28.) Although the Court grants Kim leeway to testify regarding possibilities, speculative testimony is still inadmissible. Because Kim admits that his opinion on this point is speculative, it is excluded.

In § 4.4 of Kim's report, he opines, "The KaZaA-reported IP address is not evidence that the machine running KaZaA is not behind a NAT device." However, Kim testified that he has no knowledge to support this opinion. (Kim Dep. 141-43.) He admits that he did obtain a functioning version of Kazaa and could have run it to observe its behavior, but chose not to. (Kim Dep. 144-45.) Kim admittedly has no knowledge to support his opinion regarding Kazaa's functioning and has not, in fact, observed Kazaa functioning – although he had the opportunity to do so. His opinion regarding Kazaa's functioning in this instance is excluded as not based on a reliable scientific method.

18

EXHIBIT C
Page 18 of 27

As to Kim's other opinions, the Court concludes that their alleged lack of foundation or improper factual basis goes to weight not admissibility.

## C.   Kim's Expertise

Plaintiffs argue that, while Kim is qualified in computer science, he has no experience with the Kazaa or Kazaa Lite file sharing programs or with the FastTrack file sharing network.  His only experience with Kazaa was his attempt to download the program and examine the interface in connection with this case. He did not attempt to run the program or observe its behavior.  Plaintiffs conclude that, therefore, Kim is not qualified to testify on Kazaa, Kazaa Lite, or FastTrack.  Plaintiffs also argue that Kim is unqualified to opine regarding his examination of a forensic copy of Defendant's computer because of his lack of experience in computer forensics.

Defendant responds that Kim has conducted research and is an expert in peer-to-peer systems and network security.  Kim's education and background in computer science qualify him as an expert in general computer science. Defendant admits that Kim has little experience with FastTrack, Kazaa, or Kazaa Lite, but argues that this is a universal problem because there have been few studies done of these programs in the academic community, particularly because

19

EXHIBIT C
Page 19 of 27

Kazaa is proprietary. Defendant argues that, somehow, Plaintiffs have a monopoly on Kazaa experts.

Kim is qualified in the general areas of computer science, peer-to-peer networks, and computer security. He is not specifically an expert in Kazaa, Kazaa Lite, or FastTrack. Here, Plaintiffs do not control Kazaa, FastTrack, or Kazaa Lite. In fact, Kim had a functioning copy of Kazaa, but chose not to test it. There is no institutional barrier to a computer science expert becoming expert in Kazaa without working with Plaintiffs.

Despite this fact, the Court holds that Kim is qualified to testify in this case. He is an expert in the general fields of peer-to-peer networks and computer security. Although he has not tested Kazaa, Kazaa Lite, or FastTrack firsthand, he has gained knowledge of these areas through his review of other academic studies, informed by his general expertise in peer-to-peer networks. Kim's failure to test of Kazaa, FastTrack, or Kazaa Lite goes to the weight and credibility of his opinions and will be grounds for cross examination.

## D.    Application of Rule 403

Plaintiffs also claim that Kim's testimony should be excluded under Federal Rule of Evidence 403.

20

EXHIBIT C
Page 20 of 27

### 1.    Rule 403 Standard

Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by considerations
> of undue delay, waste of time, or needless presentation of
> cumulative evidence.

"Because '[e]xpert evidence can be both powerful and quite misleading,' a

trial court must take special care to weigh the risk of unfair prejudice against the

probative value of the evidence under Fed. R. Evid. 403." Nichols v. Am. Nat'l

Ins. Co., 154 F.3d 875, 884 (8th Cir. 1998) (quoting Daubert v. Merrell Dow

Pharm., 509 U.S. 579, 595 (1993)).

### 2.    Application to Kim's Proposed Testimony

Plaintiffs argue that Kim's testimony has almost no value because he has

no experience or training with Kazaa or the FastTrack network and because his

opinions rely on speculative assumptions.  They conclude that the probative

value of his testimony is outweighed by the dangers of unfair prejudice to

Plaintiffs, of confusing the issues, and of misleading the jury.

The Court has restricted Kim's testimony to exclude opinions on causation,

opinions based on speculation, and opinions based on facts completely

EXHIBIT C
Page 21 of 27

contradicted by the record.  The basis for his remaining opinions can be tested through cross examination.  Having weighed the probative value of Kim's testimony as rebuttal against the dangers enumerated in Rule 403, the Court concludes that Rule 403 does not justify additional exclusion.

### III.    Defendant's Unopposed Motion in Limine [Docket No. 276]

As the Court orally ruled during the June 10 hearing, the parties shall refer to the previous trial as "a prior proceeding."  The results of that trial shall not be revealed to the jury.

### IV.    Plaintiffs' Motion in Limine to Preclude Defendant from Raising or Asserting Evidence of Other Lawsuits [Docket No. 279]

Plaintiffs ask that the Court bar Defendant from introducing evidence regarding other copyright lawsuits involving Plaintiffs.  As the Court explained during June 10 hearing, it will reserve ruling on this motion because the type of evidence that Defendant will be permitted to offer will depend upon the evidence and arguments offered by Plaintiffs.  All parties are warned to abide by the Rules of Evidence and Civil Procedure during trial.

### V.    Plaintiffs' Motion in Limine to Preclude Fair Use Defense [Docket No. 283]

Plaintiffs ask that Defendant be barred from asserting the fair use defense

EXHIBIT C
Page 22 of 27

because she failed to assert this affirmative defense until two weeks before trial and has waived the defense.

Fair use is an affirmative defense. <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 590 (1994) ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.") (footnotes omitted); <u>Harper & Row Publ'rs, Inc. v. Nation Enters.</u>, 471 U.S. 539, 561 (1985) ("The drafters resisted pressures from special interest groups to create presumptive categories of fair use, but structured the provision as an affirmative defense requiring a case-by-case analysis.") (citations omitted).

Defendant's reliance upon <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, is misplaced. 464 U.S. 417 (1984). In <u>Sony</u>, the Supreme Court did not hold that fair use is no longer an affirmative defense in non-commercial cases. Moreover, both <u>Campbell</u> and <u>Harper & Row</u> were decided after – and both cited to – <u>Sony</u> and both explicitly provided that fair use is an affirmative defense. The Supreme Court has explicitly rejected any fair use presumption based on commercial or non-commercial use. See <u>Campbell</u>, 510 U.S. at 584 (discussing <u>Sony</u> and holding: "The language of the statute makes clear that the

23

EXHIBIT C
Page 23 of 27

commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character. . . . As we explained in Harper & Row, Congress resisted attempts to narrow the ambit of this traditional enquiry by adopting categories of presumptively fair use, and it urged courts to preserve the breadth of their traditionally ample view of the universe of relevant evidence.") (citations omitted).

"Generally, failure to plead an affirmative defense results in a waiver of that defense." First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622 (8th Cir. 2007) (citations omitted). However, "[w]hen an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal.'" Id. (citation omitted).

In this case, the Court holds that Defendant has waived the affirmative defense of fair use. Defendant failed to raise the fair use defense in her Answer, at any time before the First Trial, during the First Trial, or at any time leading up to this retrial until only two weeks before retrial. This litigation has gone on for years, yet Plaintiffs had no inkling of this defense until the eve of trial. Because Plaintiffs had no notice of this defense, they have taken no discovery regarding

24

EXHIBIT C
Page 24 of 27

Defendant's alleged fair use defense.  The record in this case, with which this Court is intimately familiar, gave no hint that a fair use defense would be forthcoming.  It would be highly prejudicial to Plaintiffs to allow Defendant to assert this new affirmative defense on the eve of retrial, when they have no opportunity to conduct discovery on this issue and long ago missed the opportunity to file a dispositive motion regarding this affirmative defense.  The Court holds that Defendant has waived the fair use defense.  Plaintiffs' motion is granted.

## VI.   Plaintiffs' Motion in Limine to Preclude Defendant from Asserting an Innocent Infringement Defense at Trial [Docket No. 284]

Plaintiffs ask the Court to hold that Defendant cannot seek a reduction in statutory damages under 17 U.S.C. § 504, known as the innocent infringement defense.  They claim that Thomas-Rasset has waived this defense by not asserting it until two weeks before trial and, in the alternative, the defense is barred because Plaintiffs placed proper copyright notices on published copies of their copyrighted works to which Thomas-Rasset had access.

At the June 10 hearing, Defendant informed the Court that she does not oppose Plaintiffs' motion.  Therefore, Plaintiffs' motion is granted.

EXHIBIT C
Page 25 of 27

**VII.  Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction**
    [Docket No. 310]

As the Court orally ruled during the June 10 hearing, Defendant's Motion

to Dismiss for Lack of Subject Matter Jurisdiction is denied at this time because

the motion is premature.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED:**

1.  Defendant's Motion to Suppress Evidence [Docket No. 263] is
    **DENIED.**

2.  Plaintiffs' Motion in Limine to Exclude the Testimony of Defendant's
    Expert Dr. Yongdae Kim [Docket No. 272] is **GRANTED IN PART**
    and **DENIED IN PART** as set forth in this Order.

3.  Defendant's Unopposed Motion in Limine [Docket No. 276] is
    **GRANTED** as set forth in this Order.

4.  Plaintiffs' Motion in Limine to Preclude Defendant from Raising or
    Asserting Evidence of Other Lawsuits [Docket No. 279] is
    **RESERVED.**

5.  Plaintiffs' Motion in Limine to Preclude Fair Use Defense [Docket
    No. 283] is **GRANTED.**

6.  Plaintiffs' Motion in Limine to Preclude Defendant from Asserting
    an Innocent Infringement Defense at Trial [Docket No. 284] is
    **GRANTED.**

26

EXHIBIT C
Page 26 of 27

7.    Defendant's Motion to Dismiss for Lack of Subject Matter
      Jurisdiction [Docket No. 310] is **DENIED WITHOUT PREJUDICE**
      as premature.


Dated:   June 11, 2009                          s/Michael J. Davis
                                                Michael J. Davis
                                                Chief Judge
                                                United States District Court

27

EXHIBIT C
Page 27 of 27

**Kenneth R. Davis, II**, OSB No. 97113
davisk@lanepowell.com
**William T. Patton**, OSB No. 97364
pattonw@lanepowell.com
**LANE POWELL SPEARS LUBERSKY LLP**
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Phone: (503) 778-2100
Fax: (503) 778-2200

RECVD 04 SEP 14 16:21USDC-ORP

Attorneys for Plaintiffs
SONY MUSIC ENTERTAINMENT INC.; UMG
RECORDINGS, INC.; WARNER BROS.
RECORDS INC.; and BMG MUSIC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **SONY MUSIC ENTERTAINMENT INC., a Delaware corporation; UMG RECORDINGS, INC., a Delaware corporation; WARNER BROS. RECORDS INC., a Delaware corporation; and BMG MUSIC, a New York general partnership,** | No. 04-1089 BR |
| | [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION BASED ON STIPULATION |
| Plaintiffs, | |
| v. | |
| **TOM BURGUS,** | |
| Defendant. | |

The Court, having considered the Stipulation to Judgment and Permanent Injunction

executed by the parties,

PAGE 1 – [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

EXHIBIT D
Page 1 of 4

RECORD00019231

IT IS ORDERED AND ADJUDGED THAT:

1.      Plaintiffs have alleged that Defendant Thomas Burgess (erroneously sued herein as "Tom Burgus") ("Defendant") distributed (including by uploading) and/or reproduced (including by downloading) via the Internet or an online media distribution system copyrighted sound recordings owned or controlled by the Plaintiffs, without Plaintiffs' authorization, in violation of 17 U.S.C. § 501. Without admitting or denying liability, Defendant has not contested plaintiffs' allegations, and has acknowledged that such conduct is wrongful.

2.      Defendant shall pay to Plaintiffs in settlement of this action the sum of $2,850.00.

3.      Defendant shall pay Plaintiffs' costs of suit (complaint filing fee and service of process fee) in the amount of $150.00.

4.      Defendant shall be and hereby is enjoined from directly or indirectly infringing Plaintiffs' rights under federal or state law in any sound recording, whether now in existence or later created, that is owned or controlled by Plaintiffs (or any parent, subsidiary, or affiliate record label of Plaintiffs) ("Plaintiffs' Recordings"), including without limitation by:

a)      using the Internet or any online media distribution system to reproduce (*i.e.*, download) any of Plaintiffs' Recordings, to distribute (*i.e.*, upload) any of Plaintiffs' Recordings, or to make any of Plaintiffs' Recordings available for distribution to the public, except pursuant to a lawful license or with the express authority of Plaintiffs; or

PAGE 2 – [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

LANE POWELL SPEARS LUBERSKY LLP
SUITE 2100
601 SW SECOND AVENUE
PORTLAND, OREGON 97204-3158
(503) 778-2100

EXHIBIT D
Page 2 of 4

RECORD00019232

    b)       causing, authorizing, permitting, or facilitating any third party to access the

Internet or any online media distribution system through the use of an Internet

connection and/or computer equipment owned or controlled by Defendant, to

reproduce (*i.e.*, download) any of Plaintiffs' Recordings, to distribute (*i.e.*, upload)

any of Plaintiffs' Recordings, or to make any of Plaintiffs' Recordings available

for distribution to the public, except pursuant to a lawful license or with the

express authority of Plaintiffs.

Defendant also shall destroy all copies of Plaintiffs' Recordings that Defendant and/or any third

party that has used the Internet connection and/or computer equipment owned or controlled by

Defendant has downloaded without Plaintiffs' authorization onto any computer hard drive or

server owned or controlled by Defendant, and shall destroy all copies of those downloaded

recordings transferred onto any physical medium or device in Defendant's possession, custody,

or control.

    5.       Defendant irrevocably and fully waives notice of entry of the Judgment and

Permanent Injunction, and understands and agrees that violation of the Judgment and Permanent

Injunction will expose Defendant to all penalties provided by law, including for contempt of

Court.

    6.       Defendant irrevocably and fully waives any and all right to appeal this Judgment

and Permanent Injunction, to have it vacated or set aside, to seek or obtain a new trial thereon, or

otherwise to attack in any way, directly or collaterally, its validity or enforceability.

    7.       Nothing contained in the Judgment and Permanent Injunction shall limit the right

of Plaintiffs to recover damages for any and all infringements by Defendant of any right under

PAGE 3 – [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

LANE POWELL SPEARS LUBERSKY LLP
SUITE 2100
601 SW SECOND AVENUE
PORTLAND, OREGON 97204-3158
(503) 778-2100

EXHIBIT D
Page 3 of 4

RECORD00019233

federal copyright law or state law occurring after the date Defendant executes the Stipulation to Judgment and Permanent Injunction.

8.    Defendant shall not make any public statements that are inconsistent with any term of the Stipulation to Judgment and Permanent Injunction.

9.    The Court shall maintain continuing jurisdiction over this action for the purpose of enforcing this final Judgment and Permanent Injunction.

DATED: _15 September, 2004_                    By: _Anna J. Brown_
                                                    Hon. Anna J. Brown
                                                    United States District Judge

PAGE 4 – [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

LANE POWELL SPEARS LUBERSKY LLP
SUITE 2100
601 SW SECOND AVENUE
PORTLAND, OREGON  97204-3158
(503) 778-2100

EXHIBIT D
Page 4 of 4

RECORD00019234

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SONY BMG MUSIC ENTERTAINMENT, *et al.* | § § § | |
| Plaintiffs, | § § | Case No. 4:05-CV-328 |
| v. | § § | |
| KIMBERLY ARELLANES, | § § | |
| Defendant. | § § | |

## ORDER GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Before the court is the "Plaintiffs' Motion to Compel Discovery and Brief in Support" [de #19] filed August 7, 2006, along with the Defendant's response, the Plaintiffs' reply and the Defendant's surreply. Having considered the motion and responsive filings, the court is of the opinion that the motion should be GRANTED IN PART.

In this lawsuit, the Plaintiffs seek damages and injunctive relief from the Defendant for copyright infringement. The Plaintiffs allege that the Defendant, using her personal computer, downloaded and distributed copyrighted sound recordings. Pursuant to Rules 34(a) and 37 of the Federal Rules of Civil Procedure, the Plaintiffs seek a court order requiring the Defendant to produce her computer for copying and inspection of its hard drive in order to determine whether or not indeed the computer was used to download and distribute copyrighted sound recordings. Rule 34(a) provides for the inspection and copying of tangible things, which would include computer hard drives containing matters within the scope of Rule 26(b). The court agrees with the Plaintiffs that the contents of the hard drive of the computer used by the Defendant during the time period at issue

-1-

EXHIBIT E
Page 1 of 3

in this case are relevant.

The Plaintiffs seek permission for their forensic computer expert to make a mirror image of the Defendant's hard drive and then to analyze it for evidence that copyrighted material was downloaded and distributed. The Plaintiffs also want their expert to determine whether relevant music files have been deleted or electronically concealed and then to attempt to recover remnants of those files as evidence of infringement. The Plaintiffs point out that mirror-imaging the entire hard drive is necessary and not over-broad because relevant information may be placed anywhere on Defendant's hard drive by the computer operating system. The Plaintiffs argue that the Defendant's privacy objections can be accomodated through a protective order under Rule 26(c).

The Defendant, citing invasion of privacy concerns, opposes the inspection of her computer hard drive by anyone other than a neutral third party expert. She contends that her computer contains personal information, such as personal correspondence, household financial matters, school homework, and perhaps attorney-client privileged information, which would be compromised by allowing the Plaintiffs' expert to mirror-image the entire hard drive. She suggests that the parties select and the court appoint a neutral computer forensics expert to perform the inspection and copying of her computer hard drive in order to preserve her privacy on matters unconnected to the issues in this lawsuit. In order to balance the legitimate interests of both sides, the court is of the opinion that the Defendant's suggestion has merit.

It is therefore ORDERED that the Plaintiffs' Motion to Compel Discovery is GRANTED IN PART in that the parties are instructed to confer and to submit to the court within 10 days of the date of the entry of this order the name of an agreed upon neutral computer forensics expert who will mirror-image and inspect the Defendant's computer hard drive for evidence of copyright

infringement. The parties shall also confer in an effort to reach agreement on a protective order that will assure the protection of the Defendant's privacy and the confidentiality of privileged and irrelevant, non-discoverable matter. The parties shall submit the proposed protective order to the court within 10 days of the date of the entry of this order. The cost of the neutral computer forensics expert will be borne by the Plaintiffs; however, the Plaintiffs shall have the right to suggest hard drive search methodologies to the neutral expert and the expert shall make every effort to utilize those methodologies. At the conclusion of the hard drive inspection, the neutral computer forensics expert shall produce a report of his or her findings and the methodologies utilized to the parties and the court.

IT IS SO ORDERED.

**SIGNED this the 27th day of October, 2006.**

*Richard A. Schell*
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE

EXHIBIT E
Page 3 of 3



# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION
#### www.txwd.uscourts.gov

### NOTICE OF ORDERS OR JUDGMENTS
#### Fed. R. Civ. P. 77(d)

**Date:**   01/26/06

**To:**    Kristi  Belt
           600 Travis Street
           Suite 1600
           Houston, TX  77002

**Re: Case Number:**    5:05-cv-00372        **Instrument Number:**       22

**If this facsimile cannot be delivered as addressed, please call (210) 472-6550. If this transmission is incomplete, our system will attempt to resend it up to six times.**

**Number of pages including cover sheet:**       4

EXHIBIT F
Page 1 of 4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

FILED

JAN 2 5 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| ARISTA RECORDS, L.L.C.; UMG RECORDINGS, INC.; BMG MUSIC; INTERSCOPE RECORDS; ELEKTRA ENTERTAINMENT GROUP, INC.; SONY BMG MUSIC ENTERTAINMENT; and WARNER BROS. RECORDS, INC., | § § § § § § § § § | |
| Plaintiff | § § | Case No.  SA05CA0372OG |
| vs. | § § | |
| DELINA TSCHIRHART, | § § | |
| Defendant. | § § | |

**ORDER RE: INSPECTION AND**
**COPYING OF COMPUTER HARD DRIVE**

The Court hereby grants Plaintiffs' Motion to Compel and enters an Order

pursuant to Federal Rule of Civil Procedure 26(c) for the protection of confidential

information.  IT IS THEREFORE ORDERED:

Delina Tschirhart ("Defendant") will make her computer hard drive

available for imaging by Plaintiffs on or before  *2 weeks after the date this order is signed.*

On behalf of Arista Records, L.L.C, UMG Recordings, Inc., BMG Music,

Interscope Records, Elektra Entertainment Group, Inc., SONY BMG MUSIC

ENTERTAINMENT, and Warner Bros. Records, Inc. ("Plaintiffs"), an expert in

computer forensics will make one (1) verified bit-image (i.e., mirror image copy) of the

computer hard drive and will create an MD5 or equivalent hash code of Defendant's

original computer hard drive to ensure that Defendant's original hard drive is not altered

22.

and to ensure that the copy of Defendant's hard drive that is inspected is an exact duplicate of Defendant's original hard drive.

An expert in computer forensics will then examine the image of the Defendant's computer hard drive for all relevant data. At Defendant's request, one copy of the mirror image and hash code signature will also be provided to Defendant's counsel. Defendant will bear the cost of obtaining the copy of the mirror image and hash code signature.

Plaintiffs' expert in computer forensics (and any assistants pursuant to the following paragraph) will keep confidential all non-relevant information regarding Defendant's computer hard drive and will disclose such information only to counsel for ~~Plaintiffs~~ Defendant or to the Court, as appropriate.

Plaintiffs' computer forensic expert may designate assistants to help in efforts necessary to complete the forensic inspection of Defendants' computer hard drive.

After final resolution of this case, including all appeals, Plaintiffs' forensic computer expert shall destroy all images of Defendant's computer hard drive and shall confirm such destruction to the satisfaction of both parties.

Defendant will prepare a privilege log for any and all files for which Defendant claims a privilege. The parties agree that such files are subject to *in camera* review by the Court.

Plaintiffs will timely notify Defendant's counsel of and produce hard copies of any and all files or documents that Plaintiffs may seek to introduce as evidence at the trial of this action so that Defendant's counsel can timely raise any objection, including privilege, to any such evidence or any portion thereof.

Plaintiffs' expert, his or her designated assistants, and plaintiffs' counsel shall not access or examine any files designated on the privilege log unless otherwise ordered by the Court.

201989v2

IT IS SO ORDERED.

DATED:  Jany 25, 2006                      _____
                                              U. S. DISTRICT JUDGE

## Anne Allen

**From:**    ecf_bounces@nyed.uscourts.gov
**Sent:**    Wednesday, January 16, 2008 10:23 AM
**To:**      nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:05-cv-01095-DGT-RML UMG Recordings, Inc. et al v. Lindor Discovery Hearing

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 1/16/2008 at 12:22 PM EST and filed on 1/16/2008
**Case Name:**      UMG Recordings, Inc. et al v. Lindor
**Case Number:**    1:05-cv-1095
**Filer:**
**Document Number:** No document attached

**Docket Text:**
Minute Entry for proceedings held before Magistrate Judge Robert M. Levy: Richard Gabriel, Matt Oppenheim; Ray Beckerman, defendant; Richard Altman, nonparty Woody Raymond. (1) Plaintiffs' motion to compel granted. Defendant and/or nonparty Woody Raymond shall produce any Western Digital 100 GB external hard drive connected to defendant's computer on or before 7/8/04. (2) Discovery deadlines set as follows: close of fact discovery: 4/30/08; expert disclosure: plaintiffs May 31, 2008; defendant 6/30/08; close of expert discovery 7/31/08. (4) Woody Raymond's request to deem his deposition waived due to what he believes was undue delay in taking the deposition, is denied, as (a) it was not unreasonable for plaintiffs to wait until all issues before Judge Trager involving Woody Raymond were decided; (b) the court is not persuaded that Mr. Raymond has been prejudiced by any delay; and (c) Dr. Jacobson's report raises relevant issues relating to Mr. Raymond that will require his testimony. (5) Defendant and Woody Raymond have the right to depose Dr. Jacobson prior to the close of expert discovery. Defendant's request that plaintiffs bear the cost of that deposition is denied. While it is true that when defendant deposed Dr. Jacobson, the preliminary draft of his expert report did not mention an external hard drive, defendant chose to depose Dr. Jacobson before he made his expert disclosure or served his final expert report. Accordingly, defendant assumed the risk in taking this preliminary deposition, that further depositions might be needed. The court does not have the authority to require plaintiffs to fund that risk--nor would it be fair to do so. Next conference 7/31/08 at

**11:00. Discovery Hearing held on 1/16/2008 (Levy, Robert)**

**1:05-cv-1095 Notice has been electronically mailed to:**

Morlan Ty Rogers mtrogers@vanfeliu.com

Richard A. Altman altmanlaw@earthlink.net, iplawyer@earthlink.net

Brian Eugene Moran bmoran@rc.com

Ray Beckerman rbeckerman@vanfeliu.com

Lisa Jean Borodkin lborodkin@vanfeliu.com

Richard L. Gabriel richard.gabriel@hro.com, anne.allen@hro.com

Victor Bruce Kao vkao@rc.com

**1:05-cv-1095 Notice will not be electronically mailed to:**

Richard J. Guida
Robinson & Cole LLP
885 Third Avenue
Suite 2800
New York, NY 10022

Marie C. Lindor
c/o Woody A. Raymond
817 East 21th Street
Brooklyn, NY 11210

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CAPITOL RECORDS INC.,
a Delaware corporation;
SONY BMG MUSIC ENTERTAINMENT,
a Delaware general partnership;
ARISTA RECORDS LLC,
a Delaware limited liability company;
INTERSCOPE RECORDS,
a California general partnership;
WARNER BROS. RECORDS INC.,
a Delaware corporation; and
UMG RECORDINGS, INC.,
a Delaware corporation;

               Plaintiffs,

v.

JAMMIE THOMAS-RASSET,

               Defendant.

**JUDGMENT IN A CIVIL CASE**
Civil File No. 06-1497 (MJD/RLE)

---

    This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**IT IS ORDERED AND ADJUDGED THAT:**

Judgment is entered in favor of Plaintiffs and against Defendant as follows:

1

1.    Capitol Records, Inc. – $80,000 for the 1 sound recording

2.    Sony BMG Music Entertainment – $80,000 for each of the 6 sound recordings

3.    Arista Records LLC – $80,000 for each of the 2 sound recordings

4.    Interscope Records – $80,000 for each of the 3 sound recordings

5.    Warner Bros. Records Inc. – $80,000 for each of the 3 sound recordings

6.    UMG Recordings, Inc. – $80,000 for each of the 9 sound recordings

Dated:   June 19, 2009                    s/ Michael J. Davis
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court

EXHIBIT H
Page 2 of 2

Page 1

1
2                UNITED STATES DISTRICT COURT
3                     DISTRICT OF OREGON
4

       TANYA ANDERSEN, individually    )
5      and on behalf of all others     )
       similarly situated,             )
6                                      )
                         Plaintiff,    )
7                                      )
                   vs.                 ) No. CV 07-934 BR
8                                      )
       ATLANTIC RECORDING CORPORATION,)
9      a Delaware corporation;         )
       PRIORITY RECORDS, LLC, a        )
10     California limited liability    )
       company; CAPITOL RECORDS, INC.,)
11     a Delaware corporation; UMG     )
       RECORDINGS, INC., a Delaware    )
12     corporation; and BMG MUSIC, a   )
       New York general partnership;   )
13     RECORDING INDUSTRY ASSOCIATION  )
       OF AMERICA; SAFENET, INC.,      )
14     f/k/a MEDIA SENTRY, INC., a     )
       Delaware corporation;           )
15     SETTLEMENT SUPPORT CENTER, LLC,)
       a Washington limited liability )
16     company,                        )
                                       )
17                       Defendants.   )
       -----------------------------)
18

                        CONFIDENTIAL
19          DEPOSITION OF CHRISTOPHER CONNELLY
20                 New York, New York
21               Thursday, May 28, 2009
22
23
24

       Reported by:
25     FRANCIS X. FREDERICK, CSR, RPR, RMR
       JOB NO. 23079

EXHIBIT I
Page 1 of 9

Page 5

PROCEEDINGS - CONFIDENTIAL

1

2              (Connelly Exhibit 5, Declaration

3          of Christopher Connelly, marked for

4          identification as of this date.)

5  C H R I S T O P H E R   C O N N E L L Y,

6          called as a witness, having been duly

7          sworn by a Notary Public, was examined

8          and testified as follows:

9  EXAMINATION BY

10 MR. LYBECK:

11         Q.    Good afternoon, Mr. Connelly.  My

12 name is Lory Lybeck.  I introduced myself to

13 you earlier.

14         A.    Um-hum.

15         Q.    I'm taking your deposition today

16 in a case of Tanya Andersen as an individual

17 and on behalf of others similarly situated

18 because a declaration you signed has been

19 submitted in support of a motion in this case.

20             You understand that's what I'm

21 doing here today?

22         A.    Yes.

23         Q.    You're represented by counsel

24 today.  That's Mr. Mullaney.

25         A.    That's correct.

EXHIBIT I
Page 2 of 9

Page 170

1                  CONNELLY - CONFIDENTIAL
2       layman's terms.
3                  Is it simply a matter of giving
4       the KaZaA network the same commands one could
5       type in with one's fingers?
6            A.    That's correct.  It automates the
7       application just as if the normal user does it
8       and the automation was simply developed just
9       so that people wouldn't have to do it all day
10      long.
11           Q.    Okay.  Now, you run a query for --
12      let's just say a popular song; is that
13      correct?
14           A.    Yes.
15           Q.    And if it's a popular song there
16      could be -- how many responses might there be
17      in response to one of these queries?
18           A.    There could be thousands.
19           Q.    And for each of those thousands of
20      responses does MediaSentry become aware of the
21      IP address of the computer on which those
22      files reside?
23           A.    Yes, it does.
24           Q.    And how does MediaSentry know
25      that?

EXHIBIT I
Page 3 of 9

1          CONNELLY - CONFIDENTIAL

2          A.    It is obtained through the KaZaA

3     application.  The KaZaA network needs to know

4     what that IP address is in order for other

5     requests for that file to be downloaded on.

6          Q.    So are you saying that it's part

7     of the normal KaZaA functionality to know that

8     IP address?

9          A.    Yes, it is.

10         Q.    And is that IP address transmitted

11    in any way that -- is that IP address

12    transmitted?

13         A.    It's transmitted across the

14    network, yes.

15         Q.    And in what manner did MediaSentry

16    see it?

17         A.    By inspecting the data packets

18    that were retrieved.

19         Q.    Can you explain that a little bit

20    more slowly.

21         A.    Okay.  When this -- when the

22    search is executed over the network and the

23    data is retrieved for the application, the

24    MediaSentry software analyzes the data packets

25    that consisted of those responses and extracts

EXHIBIT I
Page 4 of 9

1                CONNELLY - CONFIDENTIAL

2    the IP addressee for each one of those

3    responses.

4          Q.    And what tool did MediaSentry use

5    to see this?

6          A.    A standard application that any

7    user could download off the internet.  A

8    compact filter application.

9          Q.    Do you happen to know the name of

10   the application?

11         A.    WinPcap.

12         Q.    Can you spell that for the

13   reporter.

14         A.    W-i-n-P-c-a-p.

15         Q.    Now, you mentioned that you would

16   then only focus on US IP addresses.  Did I get

17   that right?

18         A.    Yes.

19         Q.    And how exactly did you determine

20   what was a US address versus what was not a US

21   address?

22         A.    Based on the public internet

23   registries.

24         Q.    Could you walk me through that a

25   little more slowly.

EXHIBIT I
Page 5 of 9

1                   CONNELLY - CONFIDENTIAL

2        the KaZaA application is still running on that

3        computer.

4                   It then initiates the directory

5        browse and ensures that the packets that are

6        received consisting of the directory browse

7        data is of that from the IP address that's the

8        target.

9                   It then initiates the download of

10       all the files in which case that IP address is

11       then verified to make sure that each one of

12       those data packets received is of the target

13       IP address.

14                  And then, finally, when the

15       downloads are initiated it imposes that

16       firewall in which no other data could possibly

17       retrieve other than by that IP address.

18            Q.    Is it only by means of WinPcap

19       that you identify an IP address or is there

20       some other way that you also are seeing the IP

21       address in addition to WinPcap?

22            A.    There are additional methods of

23       viewing the IP address.

24            Q.    What is that?

25            A.    There is a .dat file which is a

EXHIBIT I
Page 6 of 9

1                CONNELLY - CONFIDENTIAL

2    file that's created by the KaZaA application

3    and stores information in order for the KaZaA

4    application to be able to obtain files on the

5    network.   That .dat file contains the IP

6    address of the user.

7         Q.    Where does that .dat file reside?

8         A.    It's stored on the computer's hard

9    drive.  On the MediaSentry's hard drive when

10   it's using the KaZaA application.

11        Q.    Can you walk me through that a

12   little bit more slowly.  What causes the .dat

13   file to be created and -- what causes the .dat

14   file to be created?

15        A.    When the MediaSentry software is

16   automating the KaZaA application, it initiates

17   the download of those files.  And the KaZaA

18   application creates this .dat file on the

19   computer which consists of the information

20   which it needs to perform the download which

21   contains the user's IP address.

22        Q.    And does MediaSentry have the

23   ability to read the IP address from that data

24   file?

25        A.    It does.

EXHIBIT I
Page 7 of 9

Page 181

1                    CONNELLY - CONFIDENTIAL

2          Q.     And for the reporter I suspect

3     .dat file is dot D-A-T; is that correct?

4          A.     That's correct.

5          Q.     Now, does that allow for a

6     cross-check between what WinPcap says and what

7     the .dat file says?

8          A.     Yes, it does.

9          Q.     And is that cross-check performed?

10         A.     Yes.

11         Q.     At what stage in the process?

12         A.     At the stage in which the download

13    of all the files is initiated.  And also at

14    the stage in which the complete files are

15    downloaded.

16         Q.     Now, the software that you

17    supported, to your knowledge, has anyone at

18    any time for any reason suggested any possible

19    flaws in that software?

20         A.     No, they have not.

21         Q.     Do you think you would be aware if

22    someone had?

23         A.     Yes.

24         Q.     Why do you think that?

25         A.     Because the issue would have been

EXHIBIT I
Page 8 of 9

Page 191

```
 1
 2           C E R T I F I C A T E
 3    STATE OF NEW YORK      )
 4                            : ss.
 5    COUNTY OF NEW YORK    )
 6               I, FRANCIS X. FREDERICK, a Notary
 7    Public within and for the State of New
 8    York, do hereby certify:
 9               That CHRISTOPHER CONNELLY, the
10    witness whose deposition is hereinbefore
11    set forth, was duly sworn by me and that
12    such deposition is a true record of the
13    testimony given by the witness.
14               I further certify that I am not
15    related to any of the parties to this
16    action by blood or marriage, and that I
17    am in no way interested in the outcome
18    of this matter.
19               IN WITNESS WHEREOF, I have
20    hereunto set my hand this 1st day of
21    June, 2009.
22
23                         _____
24                         FRANCIS X. FREDERICK
25
```

EXHIBIT I
Page 9 of 9